IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2021

## IN RE ASHANTI P. ET AL.[1]

**Appeal from the Juvenile Court for Montgomery County**
**Nos. 20-JV-574; 20-JV-575; 20-JV-576; 20-JV-577   Tim Barnes, Judge**

_____

## No. M2021-00039-COA-R3-PT

_____

A mother appeals the termination of her parental rights, arguing only that the court abused its discretion in denying her motion to continue the trial. Upon our review of the record, we affirm the juvenile court's denial of the motion to continue. The record contains clear and convincing evidence to support the grounds on which the mother's rights were terminated and to support a conclusion that termination was in the children's best interest; accordingly, we affirm the judgment of the juvenile court terminating the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Deidra P.

Herbert H. Slatery, III, Attorney General and Reporter, and Mary Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

This case involves the termination of a mother's rights to her four children. Deidra P. ("Mother") is the mother of Ashanti, born in April 2006; Zy'Shaun, born in April 2007; Jaquan, born in August 2008; and Tre'Jun, born in September 2009.[2] The children were

_____

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

[2] The children have different fathers, whose rights were also terminated by the juvenile court after a

placed in the custody of the Department of Children's Services ("DCS" or "the Department") on October 18, 2017, due to allegations of dependency and neglect stemming from Mother permitting the children to be around the youngest child's father, Derrick C., who is a registered sex offender. At the time DCS petitioned the juvenile court for custody of the children and for the children to be adjudicated dependent and neglected, Mother was without stable housing or employment, with no income to provide for the children's needs. The juvenile court ordered the children into DCS custody, where they have remained in various foster care placements. Mother, represented by counsel, waived her right to an adjudicatory hearing and stipulated to all the facts in the DCS petition, resulting in the juvenile court adjudicating the children to be dependent and neglected on April 9, 2018. The children were placed in their current foster home in July 2020.

The children have been removed from Mother's custody twice before. Over the course of DCS's involvement with this family, numerous permanency plans have been created. Seven permanency plans were entered into evidence at the trial and demonstrate Mother's struggle to complete the tasks set forth on the plans. The oldest plan in the record was created on November 7, 2017, and states that Mother "did not show up" for meetings with DCS staff on October 31 or on November 7 when the plan was created. However, Mother attended the hearing on November 28 where the plan was ratified by the court. The plan, which stated permanency goals of "return to parent" and "exit custody with relative," required Mother to "manage her emotional/mental health needs so that it will not interfere with her parenting" and to "maintain therapy through an appropriate provider." To that end, the plan required Mother to comply with medication management, submit to random pill counts or drug screens, and demonstrate "appropriate parenting, appropriate discipline, and not allow[] her children to be around sex offenders." She was also to sign a release of information so DCS could monitor her progress and to complete a "non-self-reporting clinical assessment with a parenting component and follow all recommendations to determine if a full psychological evaluation is needed."

This plan also tasked Mother with addressing her homelessness by "obtain[ing] housing and maintain[ing] the housing for at least three months" and that her home would be "observed to be clean with no safety concerns." To that end, Mother was to obtain and maintain appropriate housing adequate in size and furnishings for the family; provide verification of housing via a lease; pay her mortgage or rent and utilities in full and on time, and provide proof of payment to the Department within 5 days of payment; keep her home at a safe temperature for the children; submit to unannounced home visits monthly; meet minimal housekeeping standards to ensure the home is clean and clutter free; and not allow illegal activity in her home. The plan also required that all persons residing in Mother's home be able to pass background checks "to ensure all children are appropriately cared for and supervised."

_____

subsequent hearing and in a separate order. The fathers have not appealed, and thus the termination of their parental rights are not at issue in this appeal.

The plan also provided that Mother "will protect her children from sex abuse by not allowing her children to be around a registered sex offender[]." To achieve that goal, the plan required Mother "demonstrate knowledge and understanding of the effects of the abuse on the victim, and all family members, including [herself] by completing a non-offending sex abuse class in person" and to "seek legal advocacy, if necessary, to protect herself and the children from the risk of harm by the alleged abuser." She was also to comply with the terms of all court orders and safety plans and not allow contact with any registered sex offenders. The plan also provided that Mother "will participate in the children's counseling when deemed appropriate by a therapist."

Mother was also tasked with supporting her children by making "voluntary" child support payments of $10 per month per child, seeking a legal means of income, and providing written proof/pay stubs monthly to the Department.

Another permanency plan was created on February 9, 2018, and ratified by the juvenile court on March 3, 2018. Mother did not participate in the creation of this plan, and it contained a new permanency goal of adoption instead of exit custody with relative. It also set forth the following new tasks for Mother: to complete a court-ordered mental health assessment and "follow-up with [that assessment's] results and follow all recommendations." In this context, the plan sets forth the Department's concerns that Mother "has become inconsistent with her communication with the Department," causing her to not have any overnight visitation with her children; that Mother's behavior in telling the children that "the foster parents cannot discipline them" is "the driving force" behind the children's "defiant and disrespectful" behavior "and the reason why they have not been on T[rial] H[ome] V[isit] yet"; and that "the behaviors [Mother] is currently displaying are consistent with the behaviors [she] displays when she is not taking her psychotropic medication." To address these concerns, Mother was to "demonstrate consistency in her mental health treatment and communication with the Department for at least thirty days prior to a request to file for trial home visit." Additionally, Mother was to "continue to comply with her med[ication] management regimen[], as it increases her mental and emotional ability to parent her children and make decisions that are in the best interest of her children."

In March 2018, DCS provided Mother with the criteria and procedures for termination of parental rights. This form, which Mother signed, made her aware of the possible grounds for involuntary termination of her parental rights.

In May 2018, Mother participated by phone in the creation of another permanency plan; she was also present for the hearing on June 5, when the plan was ratified by the court. That plan contains the same permanency goals as the previous plan, "return to parent" and "adoption," and states, "The Department continues to work with biological mother; however, the mother continues to be resistant and non compliant. In addition,

adoption has been added to the plan due to Mother's non compliance and the children exited foster care in June of 2017 and returned October of 2017."

In August 2018, another permanency plan was created. The plan, as contained in the appellate record, does not contain a signature page of all those participating in the creation of this plan, so it is unclear whether Mother participated in the creation of this plan, which was ratified by the court on October 23, 2018. This plan indicated that Mother had obtained housing and supplied DCS with a copy of the lease.

Another plan was created on November 9, 2018, with Mother participating by phone; the juvenile court ratified the plan in December 2018. Mother's tasks did not change in any significant way; however, this plan identified its first priority as addressing Mother's homelessness, second was her mental health needs. Another plan with the same goals and responsibilities for Mother was created on February 15, 2019; it is unclear from the record whether Mother participated in the creation of this plan, as there is no signature page attached.

The most recent permanency plan in the record was created on August 6, 2019 and ratified by the court on September 26. This plan changed the goal of "adoption" back to "exit custody with relative." It also identifies Mother's need to address her mental health issues as her highest and only priority, and indicates that Mother agreed with this provision of the plan. The plan set forth only two responsibilities for Mother: to "comply with treatment recommendations received through assessments until successfully discharged by provider" and to "sign a release of information for the Department to obtain evaluation, treatment and current compliance records."

Mother has mental health issues, having been diagnosed with bipolar schizoaffective disorder, that affect her ability to parent and to hold a steady job. In January 2020, the juvenile court ordered Mother to undergo a full psychological evaluation, including a competency evaluation and IQ test. Mother did not submit to the evaluation until June 2020, and failed to complete the full evaluation.

On April 14, 2020, the Department filed a petition to terminate Mother's and the fathers' parental rights. As to Mother, the petition alleged that five grounds for termination existed: (1) that she had abandoned the children by failing to provide a suitable home, (2) that the conditions that necessitated the children's removal still persisted, (3) that Mother had failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the children, (4) that she was in substantial noncompliance with the permanency plan, and (5) that her mental incompetence prevented her from being able to adequately provide for the care and supervision of the children. The petition also alleged that termination of Mother's parental rights was in the best interests of all four children.

Mother was personally served with the summons on July 9; the summons, which bears her signature, indicates that the matter would be heard on October 29. The matter of Mother's parental rights was bifurcated from that of the fathers' rights, and the court heard evidence pertaining to the termination of Mother's parental rights on October 29.

THE TRIAL

Mother did not appear at trial, though her attorney did. The juvenile court denied Mother's attorney's oral motion to continue the matter. Three of the children testified, as well as the foster mother and the DCS caseworker.

Ashanti testified that she had been in DCS custody for "almost four years," which she described as a "stressful" experience "[b]ecause [she] d[id]n't know what's going to happen." She testified that she is "not very close to [Mother] anymore . . .[b]ecause [she] lost [her] trust. . . [w]hen [Mother] was saying that she would get us back." Ashanti said that her Mother has not been consistent with visitation and that she had not seen her in person in two years. She testified that she had been in the current foster home for three or four months, where the foster parents were taking "good care" of her, that she was happy in that home, and that she wished to be adopted by the foster parents.

Zy'Shaun testified that he "used to want to [go back home with Mother], but now I don't . . . [b]ecause I reflected on what's been going on, and I realized that … all the times that we came back into foster care was because of the same reason." He testified that he knew visitation was stopped because "[Mother] and our visitation worker didn't get along, and she was cussing her out and threatening to fight her . . . [; p]lus, she wasn't doing right." He testified that Mother does call "on and off." Zy'Shaun likes being in the foster home with all of his siblings, where he is being taken care of well. He testified that he would like to be adopted by the foster parents.

Jaquan was asked whether he thought it better for him to stay with the foster parents or to go home with Mother, and he answered that he wanted to stay with the foster parents "[b]ecause my mom has anger issues," which he testified made him feel "sad."

The foster mother testified that the children were placed with her and her husband in July 2020 and are "adjusting well." She said that Jaquan had some issues in school, but that "with the team that we're working with, he's getting better." She testified that she had previously known the children because they attended church together. Though extracurricular activities had been limited due to the COVID-19 pandemic, the foster parents had recently facilitated music lessons for each child, according to their interests: Jaquan was taking drum lessons because he "liked to hit stuff," Zy'Shaun wanted to learn to play the piano, Ashanti wanted to sing, and Tre'Jun wanted to learn to play the bass guitar.

The foster mother testified that she has always tried to facilitate a relationship between the children and Mother, though she has noticed that "when they talk to [Mother], the[ir] behavior gets really wild[, . . ] they become anxious, and usually Ja[q]uan acts out at school the next day." To combat that from happening, the foster mother testified that after the children had conversations with Mother, she would talk to them and help them process "how they [are] doing, what they're feeling, and just try to . . . reassure them that everything's going to be okay." With respect to behavioral issues, the foster mother testified that she had noticed that the children "are concerned about how the[ir] life is going to be . . . [and] worry about if they would ever have a forever home, are things going to be stable." The foster mother testified that she loves the children and that she and her husband intend to adopt the children if they become available for adoption.

Mandee Schrempp is the Department's caseworker who has worked with this family since March of 2019. She testified that ten permanency plans had been created, and Mother had not complied with the terms of the permanency plans. Specifically, she had not completed her mental health assessment and was struggling to maintain stable housing. Ms. Schrempp believed that the most important task on Mother's permanency plans was to receive mental health services and follow up with the provider's recommendations. Though Mother told her she was complying with the plan's requirement that she receive mental health services and follow up with the provider's recommendations, Ms. Schrempp learned, when she called to verify with the service provider, that Mother was failing to consistently show up for her appointments for mental health services at Centerstone. She also testified that Mother had not recently participated in random pill counts as required by the permanency plans, but when she had, more than a year prior to the date of the hearing, Mother had not been taking her medication as prescribed, as "[t]here w[ere] too many pills in the bottle." Ms. Schrempp described Mother as "unstable" and her behavior as "erratic," stating that Mother had "erratic outbursts" in front of the children during supervised visitation. According to the caseworker, Mother's mental health issues affect her ability to understand how to parent the children, and Ms. Schrempp believes that if the children were placed with Mother, it would have a detrimental effect on them.

Ms. Schrempp testified that "it's hard to sometimes even talk to her calmly and try to explain certain things to her," though "with her on medication, it's a little bit more stable." The caseworker relayed an interaction with Mother when she assisted her by transporting her to the non-offender sex abuse classes. Mother was "fine" during the car ride and walking up the steps to the building, but when Ms. Schrempp stepped aside to let Mother open the door and enter the building, Mother "got chest to chest with me, saying I'm not going to . . . tell her when to walk and how to walk." Ms. Schrempp described Mother's behavior as "a flip of the switch for no reason."

According to the caseworker, the children have been in and out of DCS custody for the past ten years due to Mother's mental health issues stemming from her diagnosis of bipolar schizoaffective disorder, which Ms. Schrempp believed she was still struggling

with as of the day of trial. Ms. Schrempp explained that Mother completed part, but not all, of the full court-ordered psychological assessment in June 2020, after the termination petition was filed. Ms. Schrempp provided transportation to the evaluation on two separate days because Mother "couldn't sit still and didn't want to answer all the questions[, s]o we made accommodations to transport her a second time." Ms. Schrempp testified that Mother "was kicked out of the building" during the second visit.

The report from the evaluation, which was entered into evidence at trial without objection, stated that Mother did not fully complete the evaluation, precluding a mental health diagnosis from being made at that time, but the psychologist was able to assess Mother's intellectual functioning as being in the "extremely low range." The psychologist also noted that "based on [Mother]'s behavior during the evaluation, it is clear that she has difficulties with anger and emotional regulation" and recommended that Mother "initiate mental health treatment services to include medication management and psychotherapy . . . [to] focus on anger, emotional regulation, and depression" and that Mother "should also attend anger management classes." The report also stated that Mother "began to yell and curse at office staff in the waiting room in front of other patients," took food that did not belong to her from the staff refrigerator and ate it, and argued with the DCS caseworker. Ultimately, the owner of the psychology practice "stated that [Mother] would not be welcome back to [the practice] to finish testing due to her behavior."

With respect to Mother's need to secure stable housing, Ms. Schrempp testified that, Mother did secure housing, and that DCS was able to perform a total of three "walk-through" inspections, but the home was not appropriate since Mother did not have enough beds for the children in her home, there was mold on the wall of the home, and she had struggled to pay her rent. As of three days before trial, Mother still did not have enough beds, and there was still mold on the wall.

Ms. Schrempp testified that the Department had made reasonable efforts to assist Mother by paying her electric bills on numerous occasions, making one rent payment for her, offering Mother transportation to and from mental health assessments that the Department offered to set up and pay for, and coordinating visitation. Ms. Schrempp testified that Mother had not maintained communication with the Department; from November 2019 through June 2020, Mother had not responded at all to her attempts to communicate. Despite this, Ms. Schrempp "proceeded to send [Mother] text messages, . . . attempted to call her, text her, [and] ask[ed] her attorney for different forms of communication as well." Ms. Schrempp testified that she knew the phone number she had for Mother was a valid one because Mother has "been communicating on the same number with her children."

Ms. Schrempp testified that Mother is willing and able to work and has always maintained that she has a job, holding "over 18" jobs during the pendency of the case, but had failed to provide DCS with pay stubs and had failed to pay child support consistently,

with "gaps of six months," and also "a year and some months" between child support payments. Ms. Schrempp testified that Mother's mental health has been a contributing factor to Mother's inability to consistently hold a job.

Ms. Schrempp recounted that Mother's visitation was suspended in November 2018, and she has continued to exercise telephone visitation with the children, though "not consistently." She also testified that the children's behavior has been a "roller-coaster of emotions" and that they have expressed to her that they wish to be adopted by their current foster parents. Ms. Schrempp said that the children have a meaningful relationship with the foster parents and that they love their foster parents, who provide a good, safe, stable, and permanent home for all four children.

### THE RULING OF THE JUVENILE COURT

At the conclusion of the proof, the juvenile court orally ruled that clear and convincing evidence existed to establish all grounds for termination that had been alleged in the petition. The court made findings pertinent to the statutory best interest factors, concluded that termination of Mother's parental rights was in the best interests of all four children, and entered an order on December 15, 2020, memorializing its oral ruling. After a subsequent hearing on the petition as it related to the children's fathers, the court entered two orders on May 27, 2021: an amended order terminating Mother's parental rights[3] and a separate order terminating the rights of both fathers.

Mother appeals, stating the following issue for our review: "[Whether t]he Trial Court erred in not granting a continuance motion when Defendant/Appellant/Mother was not able to present herself for the hearing due to transportation and/or work issues."

### STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App.

---

[3] The only difference between the amended order and the initial order is that the amended order contains the operative language from Rule 54.02 of the Tennessee Rules of Civil Procedure — that it is a final order as to Mother "upon an express determination that there is no reason for delay and upon an express direction for the entry of judgment."

2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of 'severing forever all legal rights and obligations of the parent or guardian.'" *In re W.B., IV*, 2005 WL 1021618, at *6 (quoting Tenn. Code Ann. § 36-1-113(*l*)(1)). Consequently, a parent has a constitutional right to "fundamentally fair procedures" during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the juvenile court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).

ANALYSIS

I.      Motion to Continue

A decision to grant or deny a motion to continue falls within the sound discretion of the trial court. *In re Trinity P.*, No. E2019-01251-COA-R3-PT, 2020 WL 995788, at \*4 (Tenn. Ct. App. Mar. 2, 2020). "The court retains that discretion, even when the question before it is one of termination of parental rights." *State, Dep't of Children's Servs. v. Fineout*, No. 01A01-9710-JV-00582, 1998 WL 792052, at \*2 (Tenn. Ct. App. Nov. 16, 1998) (citing *State, Dep't of Human Servs. v. Hauck,* 872 S.W.2d 916 (Tenn. Ct. App. 1993)). Thus, appellate courts decline to disturb a trial court's ruling on a motion to continue absent an abuse of discretion. *In re A'Mari B.*, 358 S.W.3d 204, 213 (Tenn. Ct. App. 2011). A trial court abuses its discretion "only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). "Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999); *see also In re Kandace D.*, No. E2017-00830-COA-R3-PT, 2018 WL 324452, at \*10 (Tenn. Ct. App. Jan. 8, 2018). When examining a trial court's discretionary decision, the appellate court reviews "the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d)" and the "legal determinations de novo without any presumption of correctness." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 525 (Tenn. 2010) (citing *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002)).

Mother bore the burden of justifying her requested continuance. This Court has observed:

> The party seeking a continuance bears the burden of establishing the circumstances that justify the continuance. *Osagie v. Peakload Temp. Servs.*, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002). Decisions regarding the grant or denial of a continuance are fact-specific and "should be viewed in the context of all the circumstances existing" at the time of the request. *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). The circumstances include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* (footnotes omitted).

*In re Paetyn M.*, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at \*5 (Tenn. Ct. App. Feb. 14, 2019).

Mother's counsel made an oral motion for a continuance on the morning of the termination hearing, and no written motion or documentation pertaining to the request for the continuance is present in the record. According to counsel, Mother contacted the attorney's office "as recently as this morning [stating] that she will not be able to attend due to transportation issues . . . [and] that she had an employment issue or employment conflict." Counsel explained:

> [Mother] was apprised of the nature of the proceedings and has been for some time. However, I'd like to remind the Court that she frequently does come to court when scheduled to come to court and that she has participated in the last hearing. It was of this general nature. So I'm going to ask the Court to perhaps reconsider the bifurcation that was decided earlier this week and perhaps set her [termination of parental rights hearing] with the other parents that are on this TPR.

Both the Department and the guardian ad litem opposed the motion. Counsel for the Department argued that Mother was aware of the date and had not demonstrated good cause for her failure to show up and argued that "it is in the children's best interest for this to go forward and that we need to have the termination today." Similarly, the guardian ad litem argued that "the children are desperately in need of stability, and . . . their mental health and their emotional health are being affected by prolonging this matter for as long as it has been."

The court then made an oral ruling:

> The Court has noted with regard to [Mother] very early on in this custodial episode, [Mother] was very diligent in attending court dates. As a matter of fact, she went a long period of time never missing a court date. Would often come in in her work uniform and was, in that regard, very circumspect.
>
> However, of late, the Court has noted that she has just not shown up in several consecutive court dates. The reason for the continuance, I do not find that sufficient. I do not think that that certainly outweighs the importance of stability for these children. This has been going on a long time. So, respectfully, I would deny the motion to continue, and we'll have our termination hearing today.

On appeal, Mother argues that the denial of her motion for a continuance was "crippling to her defense" and that granting it "would not have prejudiced any party and would promote Due Process and fundamental fairness." Her brief does not elaborate on either point. These skeletal arguments do not demonstrate that the court's decision was an abuse of discretion.

Considering the first factor, the length of time the proceeding had been pending, more than six months had elapsed since the filing of the petition. Trial courts shall, consistent with due process, expedite all contested termination of parental rights cases so as to prevent a child from languishing in foster care unnecessarily. *See* Tenn. Code Ann. § 36-1-124. The court was statutorily bound to ensure that the hearing take place within six months from the date the petition was filed. Tenn. Code Ann. § 36-1-113(k) ("The court shall ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child."). This factor certainly weighs in favor of denying the motion for a continuance.

As to the reason for the continuance, Mother did not attend the hearing due to "transportation issues" and an "employment conflict." Mother's counsel did not elaborate on the circumstances that prevented Mother's attendance, and the court made it clear on the record that Mother had missed several consecutive court dates. In *In re Paetyn M.*, 2019 WL 630124, at *5, the mother did not attend the hearing on the petition to terminate her parental rights, and her counsel requested a continuance due to the mother's urinary tract infection that had caused a doctor to excuse her from work that same day. The juvenile court found that was an insufficient reason to miss the hearing. *Id.* This Court affirmed the court's denial of the motion for a continuance, finding that Mother had not met her burden to justify the requested continuance. *Id.* Likewise, the vague reasons offered by Mother on the morning of trial are insufficient to justify continuing the trial in this case.

Relatedly, with respect to Mother's diligence in seeking a continuance, she had known of the court date since at least July 9, 2020, when she was personally served with a summons "to appear in the Juvenile Court of Montgomery County, 2 Millennium Plaza, Clarksville, Tennessee, 37040 on the 29th day of October, 2020 at 1:30 p.m. to personally answer the [petition]." The summons recites that "Failure to appear may result in judgment pro confesso[] being taken against you for the relief demanded in the Petition." That summons provided her with more than three months to find transportation to court and to arrange her work schedule to ensure that she could attend the hearing. Mother's attorney's arguments do not convey that Mother's conflicts were unforeseeable, and yet the motion to continue was not presented to the juvenile court until the day of trial. Mother was not diligent in seeking the continuance.

The fourth factor requires consideration of whether Mother was prejudiced by proceeding with the trial. Mother's counsel did not address this factor explicitly but on appeal argues that "[w]hile the Trial Court questioned Mother's veracity, a continuance to couple the Mother's trial with . . . the fathers' trial would not have prejudiced any party and would promote Due Process and fundamental fairness."[4] In *State, Department of*

---

[4] Mother's brief makes passing reference to the demands of due process, though she does not state that the court's denial of her motion to continue was a violation of her due process rights. To the extent that Mother wishes to assert that her due process rights were violated, we respectfully point out that "[t]he only

*Children's Services v. Fineout*, 1998 WL 792052, at *2, the mother did not appear at the trial on the petition to terminate her parental rights because "her ride had fallen through." Her attorney moved for a continuance, which was denied, and on appeal, this Court cautioned that "the trial court should not lightly decide to proceed with trial in the absence of a defendant who wishes to contest the termination of her parental rights," but affirmed the trial court's denial of the continuance, holding that the mother failed to show some prejudice or surprise. *Id.* In the case before us, we similarly conclude that Mother's arguments addressed only the lack of prejudice to the other side and were not sufficient to justify the grant of a continuance.

Considering the above factors and the representations of Mother's counsel to the juvenile court at the time it considered the motion, we conclude that the court did not abuse its discretion in denying Mother's request. At the time of the termination hearing, the children had been in foster care for over three years, the petition had been pending for six months, Mother had missed recent hearings, and she had been personally served with the summons three months prior to trial. The date of the trial had not changed, and Mother, through counsel, did not seek to change it until the morning of trial. The juvenile court reasonably decided to proceed with the trial on the petition as it related to Mother. Moreover, Mother was represented by counsel throughout the proceeding, and her counsel appropriately objected to certain questions and cross-examined DCS's witnesses. Accordingly, we cannot say the court abused its discretion in denying Mother's motion for a continuance.

II.     Grounds for Termination

Mother's appellate brief only addresses the denial of the motion to continue. It does not raise a single argument, much less cite legal authority or make references to the record, to demonstrate whether the court's conclusions with respect to any of the numerous grounds for termination or its best interest determination warrant reversal. Ordinarily, such omissions would constitute waiver of the issues. *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). However, the Supreme Court requires us to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest, regardless of whether the parent challenges these findings on appeal." *In re*

---

process mother was due with respect to her motion [to continue] was for the trial court to properly exercise its discretion." *In re T.R.*, No. E2017-02115-COA-R3-PT, 2018 WL 4441359, at *6 (Tenn. Ct. App. Sept. 17, 2018). Moreover, from our review of the record, there is no question that the proceedings were conducted in accordance with the fundamentally fair parental termination proceedings set forth in our statutes. *See In re Carrington H.*, 483 S.W.3d at 522-23.

*Carrington H.*, 483 S.W.3d at 525-26. We now address whether the evidence supports the grounds for termination.

### A. Abandonment by Failure to Provide a Suitable Home

A parent's rights may be terminated for abandoning his or her child. Tenn. Code Ann. § 36-1-113(g)(1).[5] Under Tenn. Code Ann. § 36-1-102(1)(A), there are several alternative definitions of "abandonment." The second of the alternative definitions of "abandonment" is stated as:

> (*a*) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). The Department must make "reasonable efforts" during a four-month period following the removal of the child by utilizing its superior resources to help the parent find a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020). DCS's "efforts are deemed reasonable under the statute if its efforts 'equal or exceed the efforts of the parent . . . toward the same goal.'" *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *6 (Tenn. Ct. App. Mar. 1, 2021) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c)). "[T]he proof necessary to support

---

[5] Though the termination statutes and the statutory definitions referenced by them have been amended since the inception of this case, we apply the version of the applicable statute that was in effect at the time the petition was filed on April 14, 2020.

- 14 -

termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal,' the ground may be established." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Thus, our inquiry is not limited "to a period of four months *immediately* following the [children's] removal." *Id.*

We also note that "the establishment of a suitable home entails considerations as to whether '[a]ppropriate care and attention' are given to the child at issue." *In re Dominic B.*, 2021 WL 774185, at *6 (quoting *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016)). A suitable home should alleviate the conditions which led to the children coming into state custody. *See In re Zacharias T.M.*, 403 S.W.3d 212, 226 (Tenn. Ct. App. 2012). A parent's failure to address mental health issues can also lead to a finding that the parent has failed to establish a suitable home. *See, e.g.*, *In re Draven K.*, No. E2019-00768-COA-R3-PT, 2020 WL 91634, at *8 (Tenn. Ct. App. Jan. 7, 2020) ("Mother's failure to address her mental health issues renders her unable to provide a safe and stable environment for the child and shows a lack of concern for the child and a lack of interest in regaining custody."); *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *12 (Tenn. Ct. App. Apr. 11, 2018) ("Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the Children and resulted in her inability to provide a suitable home environment.").

The petition alleged that the Department made reasonable efforts to assist Mother in establishing a suitable home, but that Mother had made no reasonable efforts to provide a suitable home and demonstrated a lack of concern for the children such that it appeared unlikely she would be able to provide a suitable home for them at an early date. The juvenile court deemed the Department's efforts to assist Mother as reasonable, an assessment with which we agree. The Department assisted Mother in the four months following the children's removal by assisting her with rent and utility bills, offering to pay for and provide transportation to her "mental health intake with a parenting [education] component" and her non-offender sexual abuse classes, and setting up visitation. Beyond the relevant four-month period, DCS attempted to maintain contact with Mother, who was mostly nonresponsive, and assisted with transportation to her psychological assessment.

Ms. Schrempp's testimony and the juvenile court record entered into evidence at trial established that the children came into state custody due to a lack of proper supervision stemming from Mother allowing the children to be around Derrick C., a registered sex offender and the father of her youngest child; DCS also alleged that Mother's lack of stable housing warranted the children's removal. As to the lack of proper supervision, Mother reported that she "does not have contact with the children's father anymore" to the psychologist who performed the court-ordered psychological evaluation in June 2020, and the record is devoid of other evidence as to whether Mother continued to spend time with

Derrick C. The record does, however, contain evidence that Mother was able to find a place to live, which Ms. Schrempp testified "has not changed within years" but was not suitable, as it did not have enough beds for all four children and had mold on the wall.

The testimony about the condition of Mother's home was brief and does not make clear how many beds Mother lacked or whether there was room in the dwelling to put more beds. Further, the testimony does not paint a clear picture about the overall condition of the home, other than the passing reference to the "issues with mold on the wall." However, the record contains clear and convincing evidence that Mother had failed to address her mental health issues that had prevented her from being able to provide appropriate care and attention to the children. She did not complete assessments, take her medication as prescribed, or regularly attend therapy, nor did she learn or implement appropriate parenting skills in order to provide a home environment where she was able to properly supervise and care for her children. *See In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009) (stating that counseling and assessment requirements may be "directly related to the establishment and maintenance of a suitable home" because the problems and conditions on which they focus "address matters which make the home environment suitable for raising children and which keep them from becoming dependent and neglected"). We conclude that the record contains clear and convincing evidence that Mother abandoned her children by failing to establish a home that was suitable for them. We therefore affirm the juvenile court's holding with respect to this ground.[6]

### B. Persistence of Conditions

The next ground for termination at issue on appeal is commonly known as "persistent conditions." This ground for termination applies when:

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

---

[6] The portion of the initial order finding this ground to be established contains the names of two people who are unrelated to this proceeding. It is obvious that the order, which was prepared by counsel for DCS, was drafted from a template, and that the names were not updated to reflect that of Mother's. Such an oversight is understandable on occasion, but the order terminating Mother's rights was amended by an order that was entered on May 27, 2021, following the hearing on the petition as it related to the children's fathers. The subsequent order evinces the same oversight as the first order, i.e. the same two names, completely unrelated to the proceedings at bar, are listed rather than Mother's. The gravity of the rights at issue necessitates more careful attention to detail in these matters. We are, however, satisfied that the record supports termination of Mother's parental rights on this ground in light of our independent review of the record.

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. We have stated that this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020) (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A)); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019).

The four children were removed from Mother's care and entered DCS custody during dependency and neglect proceedings in October 2017. After a hearing in December 2018, the juvenile court adjudicated the children dependent and neglected. The Department filed the petition to terminate Mother's parental rights in April 2020, which was heard in October 2020. As such, all four children were removed from the home for more than the six-month period required by the statute. *See* Tenn. Code Ann. § 36-1-113(g)(3). Moreover, the evidence, which we have detailed previously in this opinion, clearly and convincingly demonstrates Mother's failure to address her mental health issues so as to be able to supervise and parent her children in a safe, stable, and appropriate manner. This is a problem that persisted throughout the custodial episode and, given Mother's history, is unlikely to be remedied at an early date so that the children could be safely returned to her in the near future. Finally, the children are in a safe, stable home with foster parents who wish to adopt them, and continuing their relationship with Mother would diminish their chances of early integration into that home. We conclude that the evidence clearly and convincingly establishes this ground for termination and affirm the juvenile court's holding to that effect.

## C. Failure to Manifest a Willingness and Ability to Assume Custody

Another ground for termination exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Two elements must be proven by clear and convincing evidence to terminate a parent's rights under this statutory ground. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The first element "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Accordingly, "clear and convincing proof that a parent . . . has failed to manifest either ability or willingness" satisfies the first element of this ground. *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*13 (Tenn. Ct. App. June 20, 2018)). A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at \*5 (Tenn. Ct. App. Apr. 9, 2020). It is common for parents to state that they are willing to assume custody or financial responsibility for their children. However, as we have explained, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at \*5 (Tenn. Ct. App. Oct. 26, 2018). "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at \*8 (Tenn. Ct. App. Mar. 22, 2019). The second element requires the petitioner to establish that "placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d at 677.

With respect to the first element, whether Mother has demonstrated an ability and willingness to assume custody or financial responsibility for the children, the evidence is clear and convincing that Mother's circumstances are tumultuous; she has held numerous jobs but failed to pay child support consistently. Most importantly, she has not adequately addressed her significant mental health issues, which have prevented her from assuming custody. Mother failed to complete the assessments that DCS requested, set up, and paid for on Mother's behalf. While she did attend some sessions with a mental health professional, she was dismissed from the practice for her noncompliance. Ms. Schrempp testified that Mother had not been able to start a trial home visit and had not completed enough services that would make her available or willing to assume custody of the children. Ms. Schrempp also testified that Mother's mental health affects her ability to understand how to parent the children and that she did not believe that Mother would be able to provide financially or gain physical custody of the children in the near future. We think this first prong is well established.

The second prong of this ground involves whether the children would suffer substantial harm if returned to her custody. As we have explained regarding this prong:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted). The children themselves testified that while they loved Mother, they wished to be adopted. One child expressed being afraid of Mother and her "anger issues." She is mentally unstable and prone to erratic, angry, and aggressive behavior; Ms. Schrempp testified to Mother's behavior changing from calm and agreeable to agitated and angry "at the flip of a switch." Ms. Schrempp believed that if the children were placed with Mother, it would have a detrimental effect on the children. Mother's unmanaged mental health needs present a risk of substantial harm to her children; not only would they be subject to her emotional, angry outbursts and erratic behavior, but also to her impaired ability to supervise and parent them. We conclude that the second prong is clearly and convincingly proven as well and affirm the juvenile court's conclusion that the evidence establishes this ground for termination.

### D. Substantial Noncompliance with the Permanency Plan

Substantial noncompliance with the statement of responsibilities in a permanency plan is grounds for termination of a parent's rights. Tenn. Code Ann. § 36-1-113(g)(2). The Department is required to develop a permanency plan to help ensure each foster child receives adequate care. Tenn. Code Ann. § 37-2-403(a)(2)(A); *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015). As this Court explained in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004),

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In*

*re Z.J.S.*, [No. M2002-02235-COA-R3JV,] 2003 WL 21266854, at *12 [(Tenn. Ct. App. June 3, 2003)]. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Dep[']t of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*Id.* at 656–57.

In this case, the juvenile court found that Mother "has not substantially complied with the provisions of the permanency plan and, therefore, her parental rights should be terminated pursuant to T.C.A. § 36-1-113(g)(2)." The court then discussed the permanency plans and their requirements, recited that "the plan was reasonable, necessary, and in the best interest of the children," devoted four paragraphs to discussing the requirements of the plans that Mother failed to complete, and then found "by clear and convincing evidence that grounds exist for the termination of parental rights of the mother based on substantial noncompliance."

We agree with the trial court that the record establishes that the plans' requirements were reasonably related to remedying the conditions that caused the children to be removed from Mother's custody. We also conclude that the evidence does not preponderate against the trial court's findings with respect to the plans' requirements of Mother and her failure to comply with them.[7] But, despite the trial court's findings that Mother has not "substantially complied" with the plans' provisions, Tenn. Code Ann. § 36-1-113(g)(2) does not require that Mother "substantially comply" with the permanency plans. It requires the petitioner show that the parent has been "substantially noncompliant." The juvenile court may have used the phrase "based on substantial noncompliance" in the final sentence of its ruling with respect to this ground, but it failed to make the necessary finding as to Mother's degree of noncompliance or the importance of the particular requirements that she failed to meet.

However, "[s]ubstantial noncompliance is a question of law, which we review de novo with no presumption of correctness." *In re Valentine*, 79 S.W.3d at 548. Accordingly, we proceed to determine the degree of Mother's noncompliance and the importance of the particular requirements that she did not meet, guided by the following instruction from *In re Valentine*:

---

[7] Paragraph 35 of the amended order lists tasks assigned to Mother by the permanency plan created on August 6, 2019. While those tasks were assigned to Mother in other plans, the August 6, 2019 plan did not include most of the tasks listed by the court; it only addressed Mother's mental health needs.

Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

79 S.W.3d at 548–49.

As detailed previously in this opinion, the permanency plans placed numerous responsibilities on Mother, primarily relating to her mental health needs and her lack of housing. Earlier plans required Mother to secure a place to live that was "adequate in size and furnishings for the family," pay her rent and utilities on time, provide receipts of those payments to DCS, and keep the home clean and clutter free, at a safe temperature, and free of safety hazards. We think those requirements are all reasonable and related to remedying Mother's lack of safe and stable housing. Mother secured housing. While DCS provided some financial assistance to Mother in the form of a rent payment and more than one utility payment, Mother remained in the same home through the time of trial. The most recent permanency plan in the record does not contain any responsibilities for Mother relating to housing, and yet the DCS caseworker testified that her home was still inadequate. A walk-through of the home was completed three days before trial, and at that time, the home lacked enough beds and had a preexisting mold issue that had not yet been addressed. But no testimony or other evidence was offered as to how many beds were lacking, the location and extent of the mold issue, or whether the home was otherwise clean, clutter-free, at a safe temperature, or free of safety hazards. While securing safe and stable housing was a very important requirement in the permanency plans, the testimony elicited by DCS on this point was brief and did not discuss these key responsibilities. The evidence is not clear enough to lead us to a conclusion that the degree of Mother's noncompliance was substantial.

The record does, however, contain clear and convincing evidence that Mother was not in compliance with the most important provisions of the permanency plan relating to addressing her mental health issues. While she attempted, on occasion, to attend therapy, the record makes clear that she had not complied with the plan because she had not prioritized addressing her mental health needs. She did not take her medication as prescribed, as indicated by pill counts and by her behavior. Mother's failure to comply with these key tasks of submitting to assessments, medication management, and regular therapy renders her noncompliance with the requirements of the permanency plan substantial. We

hold that clear and convincing evidence exists in the record to terminate Mother's parental rights based on this ground and thus affirm the result the trial court reached.

### E. Mental Incompetence

"'A parent's rights may be terminated on the ground of mental incompetence if the court determines, by clear and convincing evidence, that the parent's mental condition is impaired to such a degree that the parent cannot adequately provide care and supervision to the child and it is unlikely that the parent will be able to do so in the near future.'" *In re Izaiah J.*, No. M2011-01848-COA-R3-PT, 2012 WL 982966, at *6 (Tenn. Ct. App. Mar. 20, 2012) (quoting *In re Billy D.H.*, No. M2011-00797-COA-R3-PT, 2011 WL 6935338, at *3 (Tenn. Ct. App. Dec. 29, 2011)). Tennessee Code Annotated section 36-1-113(g)(8) provides:

> (A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;
> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
>> (ii) That termination of parental or guardian rights is in the best interest of the child;
> (C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

The juvenile court clearly articulated its bases for concluding that this ground had been established:

> 43. Regarding the ground of mental incompetence, the Court is always cautious with this ground because this ground is very different from other grounds. So many times we see grounds that exist for the termination of parental rights that are based solely on the choices of the parents. They

choose whether or not to be compliant with permanency plans. They choose their addictions over their children. And this is not that type of case.

44. Mental incompetence is something that [Mother] did not choose. She has a diagnosis of schizoaffective disorder. So I'm very, very cautious with this. And I look to see whether or not we have someone attempting to remedy the situation and whether or not they've been given opportunities to remedy it. And frankly, it's a sad situation when you have somebody in that situation. I have no doubt that the fact that she's got -- had 18 jobs is related directly to her mental health condition.

45. We've seen it in this courtroom. These caseworkers have seen it. We've had it described in the testimony today. That's one of the reasons this matter has gone on for over three years, to give this mother the opportunity to address these issues. And unfortunately, she has not been consistent in taking her medicine. She has not been consistent in completing her mental health services. She did not complete the psychological evaluation. Although there has been a report given regarding her diagnoses.

46. She clearly has anger issues that even one of the children, in testifying, noted. She has mood stability issues, and these are all related to her diagnosis. She has, according to the testimony, highs and lows, trouble following instructions. She gets angry and aggressive over minor things such as "you go up the stairs first." It's no wonder that she's had 18 separate jobs. It's great that she's able to get jobs.

47. But the Court believes, based on the testimony and record, that she can't maintain these jobs because of her mental health issues, which have not been successfully controlled. The Court finds that her diagnoses, her mental health situation would have an adverse and direct bearing on her ability to parent.

The evidence in the record does not preponderate against those findings. In this case, Ms. Schrempp testified that Mother had a diagnosis of bipolar schizoaffective disorder, for which she was prescribed medication. The court-ordered psychological evaluation did not result in a mental health diagnosis due to Mother's early termination of the evaluation. However, the psychologist was able to complete the intellectual functioning portion of the evaluation and concluded that Mother's "general cognitive ability is within the extremely low range of intellectual functioning," such that she "may experience great difficulty in keeping up with her peers in a wide variety of situations that require thinking and reasoning abilities." Additionally, Mother demonstrated bizarre, irrational, and angry behavior during her interactions at the psychologist's office, which the psychologist noted in the report that was submitted as evidence at trial. Mother's angry outbursts at other times were also noted by the children and Ms. Schrempp in their testimony, and the evidence makes clear that Mother had not received regular mental health services or medication management. These long-running issues prevent Mother from being able to resume the care of and responsibility for her four children. Despite DCS's attempts to help Mother address her

mental health needs, Mother has not successfully done so, and we agree with the juvenile court that Mother's "mental health situation would have an adverse and direct bearing on her ability to parent." The evidence clearly and convincingly establishes that Mother is mentally incompetent to provide for the further care and supervision of the children.

Having found that the evidence establishes at least one ground for termination, we turn to an examination of whether termination is in the children's best interest.

III.     Best Interest

With respect to the best interest determination, a trial court must consider the nine factors enumerated in Tenn. Code Ann. § 36-1-113(i).[8] A court must view the child's best interest from the perspective of the child, not that of the parent. *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is obligated to consider "all the factors and all the proof," *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the parents' potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). Pertinent to these two factors, the trial court found:

---

[8] Tennessee Code Annotated section 36-1-113(i) was amended, effective April 22, 2021, to expand the list of factors for the court's consideration. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. However, the law to be applied is that which was in effect when the petition was filed on April 14, 2020. Accordingly, we will consider the evidence in light of the prior nine best interest factors, as did the juvenile court.

- 24 -

[Mother] has not made changes in her conduct or circumstances that would make it safe for the children to go home. And we have now attempted this reunification this last custodial episode three years -- over three years, and that adjustment has not been made. . . .

[Mother] has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. And that would be the case. Services have been provided, transportation, payment of electricity bills, rent, any number of services, mental health services, pill counts. And that's been going on for a long time, and it does not reasonably appear that the adjustments that we're looking for to make it safe for the children to return have been made.

The evidence does not preponderate against these findings. We have discussed the evidence at length in this opinion and conclude that, despite DCS's reasonable efforts, Mother's inconsequential efforts have not resulted in an adjustment to her circumstances to achieve lasting change with respect to her mental health issues and her ability to provide a safe and stable home for the children. These factors both weigh in favor of terminating Mother's parental rights.

The next two statutory factors focus on the parents' relationship with the children. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Pertinent to these factors, the trial court found:

[Mother] has not engaged in regular visitation with the child. Because of the behavior of the mother, failure of the mother to address her mental health situation, that visitation has not been regular. . . .

There has been a relationship. There is a relationship. These children love their mother, but as expressed by these three who testified, particularly Ashanti and Zy'Shaun, that they've changed; that they no longer believe the mother is going to successfully address the issues that they know she has. So that bond has weakened over time to the point that the children who testified believe it's in their best interest not to be reunified with their mother, but to remain with the [foster parents].

The evidence does not preponderate against these findings. Ms. Schrempp testified that Mother's visitation was suspended in November 2018, and she has continued to exercise telephone visitation with the children, though "not consistently." While testimony of the children and Ms. Schrempp, as well as the permanency plans, show that the children love their Mother and were bonded to her, we view the evidence from the perspective of

- 25 -

the child. In this case, the three oldest children offered compelling testimony that they loved their Mother but were tired of her broken promises that she would get them back and that they wished to be adopted by the foster parents. The evidence relating to these factors weighs in favor of termination.

The fifth factor looks at the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). Pertinent to this factor, the trial court found, "Those children who testified today appear to be well-adjusted where they are, happy where they are, well cared for where they are. The Court believes if they were to be placed back with their mother, that it would have a detrimental effect on their well-being, both physically and psychologically." The evidence does not preponderate against this finding, and we also conclude that returning the children to Mother's care would have a significantly detrimental effect on their emotional and psychological wellbeing. This factor weighs in favor of termination.

The sixth factor asks the court to determine whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parents' home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's ... home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.]"). Pertinent to these factors, the trial court found that they were "not applicable in this matter." We agree with respect to factor 6, but in light of the evidence and portions of the court's order detailing the inappropriateness of Mother's housing, we fail to see why the court found factor 7 was not applicable. Nevertheless, we agree that this factor does not weigh in favor of termination, as the evidence does not clearly convey why the home was physically not suitable. We have no information as to the cleanliness or tidiness of the home in general, only that Mother did not have enough beds and there was mold on a wall. The testimony does not make clear how many beds Mother lacked, if the home had room to accommodate more beds, or the location and extent of the mold issue. Neither factor 6 nor 7 weighs in favor of termination.

The eighth statutory factor evaluates the parents' mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). With respect to this factor, the trial court found:

> [Mother's] mental and emotional state would be detrimental to the children and would prevent her from effectively parenting the children. The Court would find that this is the most relevant factor of that subsection of 36-1-113. [Mother's] mental health continues to be a barrier to her ability to parent

these children the way they need to be parented; to be parented in a way that does not lead to further dependency and neglect.

The record does not preponderate against these findings. In light of the evidence set forth previously in this opinion, we conclude that Mother has not addressed her mental health needs and thus is unable to effectively provide safe and stable care and supervision for her children. We agree with the trial court that this factor weighs heavily in favor of termination.

The ninth factor looks at the parents' child support history. *See id.* § 36-1-113(i)(9). With respect to this factor, the court found that Mother has not paid child support in the amount of $10 per month per child or consistent with the child support guidelines. The record does not preponderate against this finding. The permanency plans provide that Mother would voluntarily pay $10 per month per child in support. Ms. Schrempp testified that Mother had always been employed but had failed to pay child support consistently, with "gaps of six months," and also "a year and some months" between child support payments. Thus, this factor weighs in favor of termination.

The court also considered the testimony of the children themselves. The court discussed Ashanti's testimony that she had "lost trust" in her Mother, Zy'Shaun's testimony that he used to want to go back home with Mother, but now he does not, and Jaquan's testimony that Mother has anger issues and that he wants to stay with the foster parents. This compelling testimony also weighs in favor of termination.

Viewed from the perspective of the children, we conclude that the combined weight of the facts in the record clearly and convincingly establishes that termination is in the best interest of Ashanti, Zy'Shaun, Jaquan, and Tre'Jun, who are being well cared for in a safe and stable home by foster parents who wish to adopt them. Accordingly, we affirm the termination of Mother's parental rights.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Deidra P., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE